[Cite as *Wright v. Cramer*, 2018-Ohio-764.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| TAMMY D. WRIGHT | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27586 |
| | : | |
| v. | : | Trial Court Case No. 2015-DR-1034 |
| | : | |
| RUSSELL E. CRAMER, JR. | : | (Domestic Relations Appeal) |
| | : | |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of March, 2018.

. . . . . . . . . . .

CHARLES D. LOWE, Atty. Reg. No. 0033209, 8087 Washington Village Drive, Suite 102, Dayton, Ohio 45458
      Attorney for Plaintiff-Appellee

THOMAS G. EAGLE, Atty. Reg. No. 0034492, 3400 North State Route 741, Lebanon, Ohio 45036
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, Defendant-Appellant, Russell Cramer, appeals from a judgment and decree of divorce. In a single assignment of error, Cramer contends that the trial court erred in determining the nature of, and dividing, property. Plaintiff-Appellee, Tammy Wright, filed a notice of cross-appeal but subsequently dismissed her cross-appeal. As a result, only Cramer's appeal is before us.

{¶ 2} For the reasons discussed below, we find the trial court erred in only one respect, and this was in connection with the court's judicial notice of S&P 500's return rates to calculate appreciation on the marital portion of Cramer's retirement accounts. In all other respects, the trial court did not abuse its discretion in classifying and dividing the parties' property. Accordingly, the judgment of the trial court will be affirmed in part and reversed in part, and will be remanded solely for the court to decide an appropriate method of calculating the appreciation of the marital portion of Cramer's retirement accounts.

I. Facts and Course of Proceedings

{¶ 3} Wright and Cramer were married on July 30, 2011, and no children were born as a result of the marriage. On October 30, 2015, Wright filed a divorce complaint against Cramer, and he then filed an answer and counterclaim for divorce on November 18, 2015. On February 2, 2016, the trial court ordered Cramer to pay Wright $1,300 per month in temporary spousal support.

{¶ 4} An evidentiary hearing was held on October 11, 2016, at which time the principal dispute was over division of the assets. On March 17, 2017, the trial court filed

a decision granting the divorce and dividing the parties' assets. A final decree was filed on April 19, 2017, and Cramer timely appealed from the judgment. As was noted, Wright filed a cross appeal, but dismissed it in October 2017.

## II. Property Division

{¶ 5} Cramer's sole assignment of error states that:

The Trial Court Erred in Determining the Nature of and Dividing Property.

{¶ 6} Under this assignment of error, Cramer raises nine issues, which we will address separately.

## A. Increase in Value of Premarital Real Estate

{¶ 7} Cramer's first issue for review states that:

An increase in the value of premarital real estate due to regular upkeep or market conditions remains that spouse's property.

{¶ 8} Under this issue, Cramer contends that the trial court erred in awarding Wright one-half the marital increase in value (or $2,345) of his premarital real estate. According to Cramer, the trial court incorrectly attributed this amount to mortgage pay-down, "upkeep," and "market conditions." Cramer argues that there was no evidence of mortgage pay-down and no evidence of any improvements. Instead, any increase in value was attributable to passive market conditions and should have remained Cramer's separate property.

{¶ 9} "In any divorce action, the starting point for a trial court's analysis is an equal

division of marital assets." *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, ¶ 5, citing R.C. 3105.171(C). (Other citation omitted.) Under R.C. 3105.171(A)(3)(a), and as relevant here, "marital property" includes:

> (i) All real and personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
>
> (ii) All interest that either or both of the spouses currently has in any real or personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;
>
> (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage;

{¶ 10} R.C. 3105.171(A)(3)(b) further provides that "[m]arital property" does not include "separate property." The statute defines "separate property" as follows:

> "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:
>
> * * *
>
> (ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage;

* * *

(b) The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable.

R.C. 3105.171(A)(6)(a) and (b).

{¶ 11} Because trial courts have broad discretion over the division of assets, we review the court's decision for abuse of discretion. *Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, at ¶ 5. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The Supreme Court of Ohio has stressed that "most instances of abuse of discretion will result in decisions that are simply unreasonable * * *." *Id.* In addition, the court has said that "[a] decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 12} There was no dispute at trial about the fact that a residence on Brampton Hill Road belonged to Cramer before marriage, and that the parties lived in the residence during their marriage. The parties also stipulated that the residence's value was $222,940 in 2011 and was $227,630 when the marriage ended. The increase during marriage, therefore, was $4,690. In July 2013, Cramer placed the property in the name of both parties. Wright testified that Cramer intended to gift her with a one-half interest, while Cramer testified that this was done for purposes of estate planning.

{¶ 13} In its decision, the trial court found that the residence was Cramer's separate property, but found the increase in value to be marital, based on mortgage payments, labor to upkeep the home, and market conditions. The court, therefore, awarded Wright one-half the marital increase, or $2,345. After considering the record, we find no abuse of discretion.

{¶ 14} Contrary to Cramer's contention, the evidence of record indicates that a $100,000 mortgage on the property was taken out prior to the marriage and was satisfied on November 30, 2015, shortly after Wright left the premises. Wright indicated that she was unaware that the property had been mortgaged, and only became aware of the mortgage shortly before trial. Cramer did not dispute any of these facts at trial. The income tax returns also show itemized deductions for mortgage interest during the marriage. *See, e.g.*, Plaintiff's Ex. 5, p. 3 (2012 tax return, depicting a $1,682.58 deduction for home mortgage interest).

{¶ 15} The Supreme Court of Ohio has stressed that "[t]he plain language of R.C. 3105.17[1](A)(3)(a)(iii) unambiguously mandates that when *either* spouse makes a labor, money, or in-kind contribution that *causes* an increase in the value of separate property, that increase in value is deemed marital property." (Emphasis sic; citations omitted.) *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 400, 696 N.E.2d 575 (1998). Whether Wright knew about the mortgage or paid on it during the marriage is irrelevant, as the statute requires only that either spouse made an expenditure or effort during the marriage. Cramer offered no evidence to dispute that money was paid to decrease the mortgage (and thereby increased the property's value) during the term of the marriage. As a result, the trial court did not act unreasonably, capriciously, or arbitrarily in concluding that one-

half the value of the appreciation should be awarded to Wright.

### B. Use of Rate of Return Based on Judicial Notice

{¶ 16} Cramer's second issue for review states that:

A trial court abuses its discretion in determining a martial asset by creating a hypothetical rate of return based on judicial notice of a randomly selected investment index fund instead of the actual account statements in evidence.

{¶ 17} In its decision, the trial court concluded that Cramer had $649,890.19 in premarital funds in his Simplified Employee Pension ("SEP") account, and that an additional $193,805.90 was deposited during the marriage.[1] The court took judicial notice of the S&P 500 rate of return during each year of marriage, and added interest to the marital amount. The total amount of interest added was $77,835.83. This resulted in a total amount of $271,641.73, and the court awarded half, or $135,820.86 to Wright. The trial court calculated the interest by beginning in 2011 with a marital value of zero, and added interest each year on the existing amount. The interest rates of return the court used were as follows: 2.11% in 2011; 16.00% in 2012; 32.39% in 2013; 13.69% in 2014, and 1.38% in 2015. Doc. #50, p. 12.

---

[1] "A simplified employee pension is a qualified plan pursuant to which an employer makes direct contributions to its employees' individual retirement accounts or individual retirement annuities as defined under section 408(a) and (b)." *Levine v. C.I.R.*, T.C.M. (RIA) 2005-086, 2005 WL 852194, *5 (T.C.2005). "Individuals who have net earnings from self-employment (as defined in section 1402(a)) are treated as their own employers under a simplified employee pension plan." *Id.* "Section 1402(a) defines 'net earnings from self-employment' as the gross income derived by an individual from any trade or business less deductions attributable thereto." *Id.*

{¶ 18} According to Cramer, the trial court abused its discretion in ordering payment based on a hypothetical rate rather than what was actually earned. Cramer argues that this was arbitrary and resulted in an amount that significantly exceeded the showing he made of what was actually earned.

{¶ 19} The problem here is that Cramer's "proof" was very scanty. He appeared at trial with two spreadsheets that he had prepared to show the amount of martial increase in his retirement accounts. However, Cramer did not provide the court with underlying documentation, and the fact is that it would have been impossible to determine the rate of interest on the transactions due to the frequency in which funds moved in and out of retirement accounts and were reinvested. For example, Cramer testified there had been a significant amount of movement from one fund to another, that some of the funds did not have a history chart, and that some account values changed quarterly, some changed yearly, and some changed daily. His comment was that he believed the amount he testified to was "fairly accurate." Transcript of proceedings, p. 100.

{¶ 20} Cramer further stated that he did not have any documents with him to show reinvestment withdrawals or additions that took place between the date of marriage and the date of separation. He indicated that the stack of documents reflecting this would be about two feet high, and his best estimate would be that there were twice as many transactions in his accounts as there were days between his marriage and the date the divorce was filed. *Id.* at pp. 172 and 185. Given the 51-month length of marriage and an average 30-day month, this would mean that more than 3,000 transactions occurred.

{¶ 21} As support for his position that the court could not use hypothetical rates, Cramer relies on *Mays v. Mays*, 2d Dist. Miami No. 2000-CA-54, 2001 WL 1219345 (Oct.

12, 2001). In *Mays*, we rejected an expert's evaluation of passive appreciation in a retirement account because the expert's evaluation failed to consider actual rates of return, but instead relied on "hypothetical numbers." *Id.* at *5. We, thus, concluded that "[w]ith no properly admitted evidence to establish the amount of passive appreciation traceable to Mr. Mays' separate property, the court erred by awarding Mr. Mays this appreciation." *Id.* We also commented that there was no question that the subject was "fit for expert testimony, since it relates to matters beyond the ken of the average layperson." *Id.* at *4.

{¶ 22} Notably, in *Mays*, both sides had presented experts at trial. The wife's expert testified that the actual rate of return should have been used, while the husband's expert testified that even though actual rates were available, he used averages to make his calculations. *Id.* Because the trial court had relied on this unreliable evidence from the husband's expert, we sustained the wife's assignment of error. *Id.* at *5. We then stated that:

> Upon remand, Mr. Mays will have the opportunity to present the evidence he would have presented had the trial court excluded, as it should have done, [his expert's] testimony on this subject. Upon remand, the trial court may wish to consider two options: (1) it may appoint a special master to determine actual appreciation on the account; or (2) it may allow the parties to present additional expert testimony regarding that amount of appreciation. In either case, those numbers used to arrive at the amount of passive appreciation traceable to Mr. Mays' separate property should be calculated by using the actual rates of returns and fees during the time

period in question, instead of hypothetical, average rates of returns and fees.

*Mays*, 2d Dist. Miami No. 2000-CA-54, 2001 WL 1219345, at *5.

{¶ 23} "Where * * * a party seeks to have a portion of the appreciation in a retirement account deemed passive and separate, that party bears the burden of establishing such by a preponderance of the evidence." (Citation and footnote omitted.) *Measor v. Measor*, 160 Ohio App.3d 60, 2005-Ohio-1417, 825 N.E.2d 1169, ¶ 43 (11th Dist.). In *Measor*, the trial court concluded that a husband failed to meet his burden of establishing that passive appreciation in his retirement account was separate. Among the findings made by the trial court was that many historical records were missing, that the husband's expert used an average rate of return rather than the actual rate of return, and that the husband " 'failed to prove marital contributions, including any earnings thereon.' " *Id.* at ¶ 37-40 and 45.

{¶ 24} In the case before us, the trial court clearly concluded that Cramer failed to prove the amount of interest attributable to passive appreciation in his retirement accounts from pre-marital or separate property, as opposed to marital property. We agree. Cramer's statement that his calculations were "fairly accurate" is insufficient, and as in *Measor*, many historical records were missing. The issue, however, is whether the trial court correctly resolved the problem by taking judicial notice of rates of return and applying them.

{¶ 25} Evid.R. 201(C) provides that "[a] court may take judicial notice, whether requested or not." Under Evid.R. 201(B), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial

jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Judicial notice also may be taken at "any stage of the proceeding."  Evid.R. 201(F).

{¶ 26} In addressing Cramer's argument, Wright relies on *Schroeder v. Schroeder*, 2d Dist. Montgomery No. 22237, 2008-Ohio-3875, where we took "judicial notice that Series EE U.S. savings bonds *do not* mature one year after their purchase."  (Emphasis sic.)  *Id.* at ¶ 18, citing generally, 31 C.F.R. Part 351.  This comment was dicta, however, as we had already decided to reverse the trial court's calculation of the value of the bonds. *Id.* at ¶ 17-18.  Furthermore, taking judicial notice of regulations differs from taking judicial note of rates of return.

{¶ 27} More to the point is *Stamm v. Stamm*, 6th Dist. Fulton No. F-08-009, 2009-Ohio-4924.  In that case, the trial court used a 4.69% published rate of 20-year Treasury bills to calculate the anticipated yearly rate of return on income-producing assets that were distributed to a spouse.  *Id.* at ¶ 17.  The affected spouse argued this was error because there was no evidence in the record supporting the rate of return and use of the rate of return " 'could not reasonably be anticipated.' "  *Id.* at ¶ 41-42.  However, the Sixth District Court of Appeals found no abuse of discretion, stating that:

Judicial notice of adjudicative facts is governed by Evid.R. 201. Under Evid.R. 201(C) "[a] court may take judicial notice, whether requested or not." The kind of facts subject to judicial notice include those facts "capable of accurate and ready determination" by sources "whose accuracy cannot reasonably be questioned."  Evid.R. 201(B)(2).  Daily interest rates on treasury bills are published and readily available to anyone.  Accordingly,

judicial notice affords an evidentiary basis for consideration of the treasury rate used by the trial court.

*Id.* at ¶ 46.

{¶ 28} Of note is the fact that R.C. 3119.01(B)(11)(b) allows courts to use local passbook savings rates or other appropriate rates as decided by a court to calculate imputed income from non-income producing assets of persons who are voluntarily unemployed.   An exception is that the rate is not to exceed the interest rate specified in R.C. 1343.03(A).   *Id.*   The court of appeals referenced this fact in *Stamm,* but found it distinguishable from the situation before it, which did not involve voluntary unemployment. *Id.* at ¶ 43 and fn.1.   Nonetheless, the court still allowed judicial notice to be taken of the rate for 20-year Treasury bills.

{¶ 29} Similarly, in *Smart v. Smart*, 3d Dist. Shelby No. 17-07-10, 2008-Ohio-1996, the magistrate and trial court made the following calculations to decide how much cash flow an obligor could earn from an investment for purposes of child support: "the magistrate noted that [the obligor] had assets of approximately $650,000 that were placed in an investment fund subject to market fluctuations.   He took judicial notice of the fact that [the obligor] could realize a return of 5 percent or more if he were to invest his assets in a secure certificate of deposit.   The magistrate determined that interest income in the amount of $32,500 per year should be imputed to [the obligor]."   (Citations omitted.)   *Id.* at ¶ 9.

{¶ 30} The court of appeals rejected the obligor's argument that the trial court had arbitrarily imposed a potential five percent interest rate.   In this regard, the court stated that "there was testimony before the trial court that local banks were paying 4.8 percent-

5 percent interest on certificates of deposit, the magistrate stated he had taken judicial notice of the published rates of interest, and, the rate of interest he imputed was well below the statutory interest rates." *Id.* at ¶ 38, citing R.C. 1343.03.

{¶ 31} In *Parrick v. Parrick*, 3d Dist. Hancock No. 5-12-12, 2013-Ohio-422, the court of appeals affirmed a trial court's decision to take judicial notice of the IRS reimbursement rate for mileage. This rate was used to support a finding that a lower business rate was not excessive for purposes of excluding certain income in calculating child support. *Id.* at ¶ 33.

{¶ 32} *In the Matter of Petty*, 3d Dist. Auglaize No. 2-80-4, 1980 WL 351976 (June 27, 1980), a trial court judicially noticed the "generally inflationary environment" and ordered automatic child support increases of 10% for a period of years. *Id.* at *2. On appeal, the Third District Court of Appeals commented that "past rates of inflation are statistical and historical facts no longer subject to speculation." *Id.* The court also stated that "[h]owever, it is also a well[-]recognized economic fact that the specific rates of inflation, and hence the actual impact of this general factor are subject to wide variation. To, in effect, properly take judicial notice not only of the trend and of the past fluctuations in rates, but then to forecast by judicial notice that trend over a period of future years is error." *Id.* Additionally, the court noted that inflation rates vary in specific areas of the country. *Id.* at *3. As a result, the court held that the trial court had no legal basis for its schedule of future child support changes. *Id.* at *3.

{¶ 33} In *Willis v. Willis*, 11th Dist. Geauga No. 1208, 1985 WL 10043 (Sept. 27, 1985), the trial court had failed on remand to assign a present value to a pension fund for purposes of making a property division. *Id.* at *1. On appeal, the Eleventh District Court

of Appeals noted that the employer who maintained the pension fund had used a 6% annual assumption interest rate to compute the fund's actuarial value. *Id.* at *2. The court of appeals took "judicial notice that interest rates on earnings from the investments from pension funds in the market place vary, and that they are not constant." *Id.* As a result, the court elected to apply a 6% annual interest rate to determine the fund's present value. *Id.*

{¶ 34} From the above cases, some general principles can be ascertained. First, judicial notice is generally appropriate for purposes of calculating past rates of return or interest rates. Second, judicial notice of future rates of return has been taken for purposes of deciding what potential cash flow should be included in income for purposes of support. However, the rates applied were also below statutory interest rates. Third, judicial notice may not be taken in situations where it is simply too speculative or where no explanation of the court's reasoning or basis is provided.

{¶ 35} On consideration of these factors, we conclude that the trial court erred in assessing interest rates for the years 2011 through 2015, based on the S&P 500 rate of return. We do note that courts have taken judicial notice of published stock prices and stock price data as published by S&P and other entities. *See, e.g.*, *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 134 (D.Conn.2007) (finding "accuracy of the S&P Daily Stock Price Record is not subject to reasonable dispute"); *White Marlin Open, Inc. v. Heasley*, Civil Action No.: RDB-16-3105, 2017 WL 3434290, *2, fn.2 (D. Md., Aug. 10, 2017) (taking "judicial notice of the fact that the Dow Jones Industrial Average has increased over 14% and the S&P 500 Index has increased over 10% from August 8, 2016 to August 8, 2017); *In re MGM Mirage Securities Litigation*, No. 2:09–cv–01558-GMN-VCF, 2013 WL

5435832, *4 (D. Nev., Sept. 26, 2013) (taking judicial notice of "historical stock prices as recorded by Yahoo! Finance1 of MGM, MGM's competitors, and the S & P 500," to the extent they are "relevant and admissible").

{¶ 36} While these kinds of matters may be judicially noticed, Cramer correctly notes that the trial court did not explain why it chose S&P 500 over any other method of calculating appreciation on the marital portion of the retirement accounts. Unquestionably, Cramer failed to submit appropriate evidence on this point. Nonetheless, the trial court must provide a reasoned basis for choosing a particular interest rate to be applied. Accordingly, the second issue for review is sustained, and this part of the judgment will be reversed and remanded to the trial court for further proceedings, solely with respect to the calculation of appreciation on the marital portion of Cramer's retirement accounts.

### C.   Marital Contributions to SEP

{¶ 37} Cramer's third issue for review states that:

The trial court erred in finding $193,805.90 of marital contributions to Husband's SEP IRA instead of only the $167,000.00 which came from marital sources, and not awarding Husband the correct amount from his premarital contributions and the passive appreciation to it.

{¶ 38} Under this issue, Cramer presents a number of arguments.   The first is that the trial court incorrectly counted all five tax calendar years of contributions, which included 60 months, rather than the 51 months of the marriage.   In addition, Cramer contends that the trial court erred in including contributions on Cramer's 2015 tax return,

which was filed in 2016, after the termination date of the marriage. According to Cramer, this included a contribution made in 2016, which related back for tax purposes.

{¶ 39} "Any property or an interest therein that either spouse owns when the marriage terminates is presumed to be marital property." *Maloney v. Maloney*, 160 Ohio App.3d 209, 2005-Ohio-1368, 826 N.E.2d 864, ¶ 20 (2d Dist.) "The burden of proof that specific property owned when the marriage terminates is not marital but separate is upon the proponent of the claim." *Fisher v. Fisher*, 2d Dist. Montgomery No. 20398, 2004-Ohio-7255, ¶ 9, citing *Peck v. Peck*, 96 Ohio App.3d 731, 645 N.E.2d 1300 (12th Dist.1994). This "burden must be sustained by a preponderance of the evidence." (Citation omitted.) *Id.* Co-mingling does not destroy the separate nature of property, but the separate property must be traceable. *Id.* "Because traceability presents a question of fact, we must give deference to the trial court's findings, and the court's decision on the matter will not be reversed as against the manifest weight of the evidence when it is supported by competent, credible evidence." *Maloney* at ¶ 23, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶ 40} In concluding that $193,805.90 of the SEP contributions were marital, the trial court relied on the parties' 2011-2015 income tax returns, which indicated that the following amounts were deposited in Cramer's SEP during those years: $40,168.33 (2011); $43,188.45 (2012); $42,449.29 (2013); $41,528.29 (2014); and $26,471.54 (2015 – Cramer filing separately). *See* Plaintiff's Exs. 2-6 or Defendant's Exs. M-Q.[2]

{¶ 41} The tax returns do not indicate any dates when these contributions were

---

[2] Both parties filed the same sets of tax returns.

made to Cramer's SEP plan, and Cramer did not testify about when payments were specifically made or how they were made. Cramer did testify about his 2015 tax return, but *did not* state that he made the $26,417 contribution to his SEP in 2016. *See* Transcript of Proceedings, p. 119. Thus, regardless of whether Cramer might be entitled to make a contribution for 2015 in 2016, he failed to show that he did so. Accordingly, since Cramer failed to provide any specific evidence, the trial court was entitled to use the total amount of the contributions listed on Cramer's tax returns to calculate marital contributions.

**{¶ 42}** Cramer also argues that the trial court's figure improperly included $59,351 in rollovers from other premarital accounts, plus passive appreciation of $19,720.69. The pages of the transcript that Cramer cites (pp. 85-86) do not contain this information. Furthermore, only one tax return (2012) shows a rollover or distribution from an IRA, pension, or annuity. This distribution was for more than $96,000.[3]

**{¶ 43}** Cramer did not report the $59,351 "rollover" as a taxable transaction, meaning that he must have rolled the money over into another IRA. "A rollover occurs when distributions from certain qualified retirement plans are contributed or deposited into another qualified retirement plan within a 60–day time period." *Sadberry v. C.I.R.*, 87 T.C.M. (CCH) 982, T.C.M. (RIA) 2004-040, 2004 WL 303934,*6 (T.C.2004). A rollover

---

[3] The $96,898 rollover on the 2012 tax returns differs significantly from the $59,351 rollover of premarital funds that Cramer claims. This is typical of the confusing nature of Cramer's testimony. There is also a substantial discrepancy between Cramer's testimony of how much was in his retirement accounts at the date the marriage terminated ($858,767.17) and the amount, he himself, calculated was in the accounts at some point prior to the separation ($949,053.29). *See* Defendant's Ex. DD; Plaintiff's Ex. 25; and Transcript of Proceedings, p. 163. As will be noted below, other exhibits show additional contradiction over the amount of retirement funds Cramer actually had.

cannot be made from a nonqualified plan, and distributions or attempted rollovers from nonqualified plans will be taxable. *Id.* at *2-6 (finding that attempted rollovers from nonqualified annuity plans were taxable).

**{¶ 44}** On the 2012 tax return, Cramer also claimed that he had made $43,188.45 in contributions to his SEP that year, and deducted that amount from his taxable income. *See* Plaintiff's Ex. 5, p. 1. According to Cramer's own testimony, the amounts he put into his SEP were based on his wages; if he had no wages, he would have no contributions. *See* Transcript of Proceedings, p. 101. Thus, the 2012 "rollover" and the amounts contributed to the SEP during marriage were distinct items, and the trial court did not incorrectly include a $59,351 rollover in determining the marital value of contributions to the SEP. Notably, if the trial court had incorrectly included the only proven rollover (the 2012 IRA rollover) in its calculations, the marital value the court assessed could have totaled $290,704.34 prior to any interest the court added, not $193,805.90.[4]

**{¶ 45}** The same analysis applies to the $19,720.69 amount that Cramer contends the trial court improperly added to the marital value of the retirement accounts. Again, Cramer made no attempt to show that this amount was included in his contributions to his SEP between 2011 and 2015, and if the trial court had included it, the amount divided between the parties would have been higher. Instead of relying on passive appreciation, the court focused only on what Cramer reported as "contributions" on his tax returns.

**{¶ 46}** Cramer further contends that the total balance in his retirement accounts increased only by a total of $227,741.41 during marriage, and that the marital portion

---

[4] $193,805.90 (the figure the court used from the tax returns) plus $96,898.44 (the 2012 IRA distribution reported but not taxed) equals $290,704.34.

should have been only $59,212.77. This is based on Cramer's assertion that his premarital share of the amount of the retirement account at termination was 74%. As was noted, the testimony was conflicting, confusing, and contradictory, meaning that Cramer failed to meet his burden of proof. *See, e.g., Fisher*, 2d Dist. Montgomery No. 20398, 2004-Ohio-7255, at ¶ 9.

**{¶ 47}** Moreover, this theory makes little sense, as it disregards the actual amount that the parties claimed on their tax returns. The trial court's method of calculating the marital share by relying on what was reported on the tax returns was appropriate, and the court had broad discretion over how to divide this amount.

**{¶ 48}** Accordingly, Cramer's third issue lacks merit.

## D. Allianz Annuity

**{¶ 49}** Cramer's fourth issue for review states that:

The trial court erred in dividing the Allianz Annuity which was either part of the premarital portion of Husband's SEP IRA or was already included in the martial portion of the same SEP IRA, and was therefore double-counted by diving both the marital portion of the SEP IRA and also the Allianz Annuity that was part of the same SEP IRA.

**{¶ 50}** The trial court concluded that there was no evidence presented concerning the creation of an annuity with Allianz Life Insurance Company of America that had a cash surrender value of $264,558.27 as of August 1, 2015. *See* Doc. #50, p. 13, citing Defendant's Ex. W. The trial court, therefore, concluded this was a marital asset and divided it equally between the parties. According to Cramer, the trial court incorrectly

double-counted this item because it was part of Cramer's retirement funds at the end of the marriage.

{¶ 51} As was noted, many fund transfers occurred during the marriage, and they were poorly documented. Cramer testified that he had $652,258.53 in retirement funds at the time of marriage and had $858,767.17 in retirement funds when Wright filed for divorce. He did not submit underlying documents, but offered a spreadsheet (Ex. DD) and testimony to track his retirement assets.

{¶ 52} In testimony, Cramer stated that column one on Ex. DD consisted of investment instruments that were in his retirement account at the time of marriage. Thirteen accounts are listed. Column two consisted of "premarital funds" rolled over into Cramer's SEP. According to Cramer, the third column consisted of "rollover" of investments he had in premarital funds that matured during marriage, and the fourth column showed how some of the money moved around during marriage.

{¶ 53} Finally, the last column on Ex. DD consisted of accounts that Cramer claimed represented his retirement accounts at the date the marriage ended. These included a MetLife account of $448,260.75, an Allianz account of $264,558.27, a Security Benefits account of $111,612.16, and three of the original 13 retirement accounts. Allegedly, these accounts totaled $858,767.17.

{¶ 54} Regarding the Allianz account, Ex. DD alleges that the trail of funds began with a Sun annuity of $75,887.90 and two "Key" CDs totaling $92,756.11. These three items totaled $168,644.01. The second column shows only two items and no identification of the source of these items, which have an alleged total value of $179,472.35. These two figures do not correspond with the figures shown in the first

column: the first item listed is greater than the amount of the Sun annuity, and the other item is less than the combined total of the two Key CDs. No underlying documentation was provided, and it is unclear whether the amounts in that column were still being held in Sun and Key retirement accounts, or, if not, where they had been transferred. Moreover, no dates or explanation for the change in values were provided.

{¶ 55} The third column and fourth columns on Ex. DD contain the following statements: "3/12/ SEP $43,188.45," and "3/13/ SEP + rollover $42,449.27."[5] While the latter item is labeled as a "rollover," or at least a rollover in part, the source of the "rollover" is not indicated. The two items from column two are also repeated in the fourth column, and reflect a total amount carried over from column two, of $179,472.35. The total of all these items, with respect to the alleged Allianz account are $265,110.07.

{¶ 56} This amount does not correspond with the amount ($264,558.27) listed for Allianz in the final column of Ex. DD, nor does it match the cash surrender amount listed for the Allianz fixed index annuity statement on Defendant's Ex. W ($264,558.27). It also does not match the $297,897.92 figure that Cramer wrote down as the figure for his Allianz retirement account before the parties' separation. *See* Plaintiff's Ex. 25.

{¶ 57} As was previously indicated, the only rollover listed on any of Cramer's tax returns was a $96,898 IRA distribution that was reported as nontaxable income on the 2012 tax return. The 2012 return also lists a SEP contribution amount matching the $43,188.45 "SEP" amount found in the third and fourth columns of Ex. DD. If this item had been a transfer from another premarital retirement account as Cramer claimed, rather

---

[5] The third column does not actually contain any figures; it simply designates dates and with respect to the 3/13 item, that it is "SEP + rollover."

than a contribution from wages, one assumes it would have been reported either as a non-taxable distribution from a qualified plan or as a taxable rollover from a nonqualified plan on the 2012 tax return. *Sadberry*, 87 T.C.M. (CCH) 982, T.C.M. (RIA) 2004-040, 2004 WL 303934, at *2-6. However, it was not reported as either.

**{¶ 58}** Similarly the $42,449.27 "SEP + rollover" amount on Ex. DD that was allegedly transferred to an Allianz SEP in March 2013, is consistent with an amount ($42,447.29) listed on Cramer's 2013 tax return as a "contribution" to his SEP plan. *See* Plaintiff's Ex. 4, p. 1. This item is specifically listed on Ex. DD as a rollover or at least a partial rollover, and according to Cramer, was a transfer of his pre-marital retirement money. Again, one would assume that if this item was a "rollover" as indicated on Ex. DD or as a transfer of pre-existing retirement funds as Cramer claimed, it would have been designated as such on the 2013 tax return i.e., as a nontaxable distribution from a qualified plan or a taxable rollover from a nonqualified plan, rather than as a "contribution."

**{¶ 59}** The significance of these facts is that the $96,898 nontaxable IRA distribution on the 2012 federal tax return was not an item that was able to be deducted from taxable income; it was simply an item that was rolled over from an existing qualified retirement account, and, therefore, was not included as taxable income. In contrast, items classified as SEP "contributions" on the tax returns from 2011-2015 were able to be deducted from taxable income, and therefore, reduced Cramer's overall tax liability. If they had been distributions or rollovers from existing (or premarital retirement accounts, whether qualified or nonqualified), they would not have been able to be deducted from Cramer's taxable income and would not have reduced his tax liability.

**{¶ 60}** Consistent with this analysis, Plaintiff's Ex. 23 contains a document sent to

Cramer from Allianz concerning a "SEP IRA," with contract number 70994632. The document that was sent from Allianz was labeled as a "2013 Form 5498" and indicates that it contains "IRA Contribution Information." The form states that it contains values as of December 31, 2013. According to the listed information, there were no rollover or IRA contributions to the Allianz SEP that year. Furthermore, this Allianz SEP IRA had a fair market value on December 31, 2013, of $154,790 and showed SEP contributions in that year of $43,188.45. This latter number is consistent with the 2012 tax return, which shows that Cramer made "SEP" contributions of $43,188.45 in 2012; it is inconsistent, however, with the 2013 tax return, which shows that Cramer made "SEP" contributions of $42,449.29 in 2013. As a result, the information reported on Ex. DD is inconsistent with the amounts actually reflected on Cramer's tax returns for 2012 and 2013.

{¶ 61} Again, had Cramer simply rolled over qualified or nonqualified premarital retirement funds into the Allianz account rather than paying the contribution from his wages, he would not have been able to claim a deduction from his taxable income for SEP contributions in 2013. Cramer offered no explanation and did not provide underlying documentation for any of these matters. He also did not provide expert testimony.

{¶ 62} We also note that Cramer submitted Defendant's Ex. W in order to establish the $264,558.27 account value that was listed for the Allianz retirement account listed on Defendant's Ex. DD. Ex. W, from Allianz to Cramer, is titled "Your annual fixed index annuity statement for August 2, 2014 through August 1, 2015." The statement says that the beginning cash surrender value was $257,823.32 on August 2, 2014, that on each contract anniversary, 10% of the premium bonus is vested, and that at the beginning of

contract year 11, 100% of the premium bonus is vested. The vested premium bonus is listed as $4,889.90 and the unvested premium bonus was listed as $11,409.75.

{¶ 63} Ex. W does not indicate that the Allianz annuity is a SEP account, and it does not contain an account number. Notably, the exhibit contains only one page (page three) of six. No testimony was offered to indicate the meaning of any of the items like "vested" or "unvested" premium bonus, nor did Cramer indicate when this annuity was purchased.

{¶ 64} In contrast, as was noted, Plaintiff's Ex. 23, or the Allianz SEP IRA, had a fair market value on December 31, 2013 of $154,790.36 and listed SEP contributions in 2013 of $43,188.45. No testimony was offered to explain the Form 5498 (or indeed, any of the documents), and we cannot tell whether the fair market value on December 31, 2013 includes the SEP contribution. We assume that $154,790.36 was the account's total value on that date, since "fair market value" is generally defined "as that price which would be agreed upon between a willing seller and a willing buyer in a voluntary sale on the open market." (Citation omitted.) *Wray v. Stvartak*, 121 Ohio App.3d 462, 471, 700 N.E.2d 347 (6th Dist.1997). This amount is significantly lower than the amount Cramer claimed was in the Allianz account ($264,588) as of the date the marriage ended. Admittedly, Cramer could have added other funds, but none of the other items Cramer connected to the Allianz account in Ex. DD, if added to $154,790.36, would match the $264,588.27 amount reflected in the final column of Ex. DD.

{¶ 65} The point here is that there were numerous inconsistencies and contradictions in Cramer's testimony and documentation, leading to a reasonable inference that more than one Allianz account existed. Since Cramer had the burden of

establishing that certain items came from premarital funds and tracing those funds, there is no way a factfinder could conclude that he met his burden. Cramer could have provided underlying documents, and could have assisted the court by presenting expert testimony to explain these very complicated financial matters. He failed to do so. As a result, the trial court did not abuse its discretion in concluding that there was no evidence presented regarding the creation of the annuity, that the amount of the annuity was marital property, and that it should be equally divided.

{¶ 66} Accordingly, the fourth issue for review is without merit.

### E. Marital Contributions to Cash Accounts

{¶ 67} Cramer's fifth issue for review is as follows:

> The trial court erred in finding $286,000.00 in marital contributions to cash accounts instead of awarding Husband his premarital contributions to it.

{¶ 68} Under this issue, Cramer contends that the trial court incorrectly double-counted the Dreyfus fund of $44,580.66 as part of his cash accounts when that account had been rolled over into a SEP during the marriage and was counted there as well.

{¶ 69} Based on Defendant's Exs. NN, OO, PP, and UU, the trial court concluded that Cramer had $393,552.81 in cash accounts at the time of marriage. This was about $660 more than Cramer claimed as separate property, and included the Dreyfus account, which was valued at $44,580.66 at the time of the marriage. According to Ex. OO, Dreyfus was a U.S. Treasury money market account.

{¶ 70} The trial court noted Cramer's testimony that he had moved the Dreyfus

account into a MetLife retirement account during marriage. When the trial court totaled the cash accounts that existed at the end of marriage, it did not include the Dreyfus fund. *See* Doc. # 50, p. 15. The court found a total of $679,671.05 in cash accounts, including the following accounts: GECU Money Market, GECU 1 year jumbo, GECU 1 year jumbo, GECU checking, REIT account, Key Consolidated Acc., and Security Benefit (Defendant's Exs. CC, MM, QQ, RR, SS, and TT). After crediting Cramer with his premarital separate property, the court found an increase in value of $286,118.24, and concluded that it was equitable to equally divide the increase in the cash accounts during marriage. The court, therefore, awarded Wright $143,059.12.

**{¶ 71}** Viewed from this perspective, Cramer's argument is not persuasive. He was credited with the cash value of the Dreyfus account in connection with his separate property at the time of marriage, and Dreyfus was not included in the cash assets at the end of marriage. The effect of this is that the cash assets to be divided at the end of the marriage were lower than they would have been if the Dreyfus account had been included, and the trial court did not "double-count" this asset. In fact, Cramer received proportionately more of the cash assets than he otherwise would have received.[6]

**{¶ 72}** Cramer also argues that the trial court improperly moved the Security Benefits account from his SEP/IRA funds into cash accounts. Cramer claims in his brief that there is a difference between a cash account and a qualified SEP/IRA account because the former is "liquid and fungible," and the latter is "highly regulated and

---

[6] Specifically, $679,671.05 (cash found at end of marriage) plus $44,580.66 (Dreyfus) equals $724,251.71. $724,251.71 minus $393,552.81 (Cramer's separate property at beginning of marriage) equals $330,698.90. That amount divided equally gives each party $165,349.45. Instead of receiving this amount, Wright received only $143,059.12.

restricted, particularly for contributions, withdrawals, and tax consequences."

{¶ 73} Defendant's Ex. CC is a Security Benefit Annuity statement for March 23, 2015. It indicates an additional premium was purchased on March 23, 2015, in the amount of $81,565.57. A 6% bonus was added, making a total additional premium of $86,459.50 that was added to an existing fixed account of $86,459.50. The total of the account was then $130,479.49.

{¶ 74} Inexplicably, on Defendant's Ex. DD, Cramer included a Security Benefit account in his retirement funds and valued it only at $111,612.66 when the marriage ended in October 2015. Cramer provided no documentation to explain this reduced amount, nor did he provide documents indicating where the cash to purchase the Security Benefit annuity came from. On Ex. DD, Cramer claimed that a Midland retirement account had increased to $81,565.57 at some unspecified point, and that it was transferred into the Security Benefits account on March 15, 2015. This figure is consistent with the information in Ex. CC, which shows a similar amount as an additional premium on March 23, 2015.

{¶ 75} However, Cramer did not report any rollovers or SEP/IRA distributions on his 2015 tax return; his only reported transaction on that tax return is a $26,471 "contribution" to his SEP. *See* Plaintiff's Ex. 2; Defendant's Ex. Q. Cramer claims the Security Benefits account listed on Ex. DD was part of his SEP/IRA, but he provided no evidence of that fact other than his own testimony.

{¶ 76} If the Midland transaction that occurred in March 2015 was, indeed, a transfer of a highly regulated retirement account, it would have been reported as such on Cramer's tax returns. Again, Cramer failed to provide documentation, nor did he provide

the trial court with expert testimony on the subject.

**{¶ 77}** Furthermore, the other figure of $41,528.29 shown on Ex. DD as having been transferred in March 2015 to Security Benefits is inconsistent with Ex. CC and is less than half the amount that existed in the account prior to the premium purchase reflected in Ex. CC. Again, no underlying documentation was provided, and if this transfer were of a regulated SEP/IRA as Cramer suggests, the rollover would have been includable on the 2015 tax return.

**{¶ 78}** The record also contains other unexplained contradictions, including a J.P Turner & Company SEP/IRA that shows a balance of $811,196.08 on July 31, 2015. The value of the same account on December 31, 2011, as shown in Defendant's Ex. AA, was $128,742.55. When asked at trial to explain the substantial increase in funds between the relevant dates, Cramer mentioned transfers of various accounts, that had been transferred and rolled into MetLife (valued at $448,000 on Defendant's Ex. DD as retirement funds), and an entity called CTXV (which is claimed on Ex. DD to have no value). Cramer did not mention the Security Benefit account in this context. In other words, he did not claim it was part of the $811,196.08 SEP/IRA.

**{¶ 79}** At this point, the following exchange occurred:

Q. Do you have with you the statements showing those rollovers and those transactions whereby 126,000 became 811,000?

A. I do not have those with me. I've got them, but not with me. This – this was a little tricky to do, because I seemed to have lost some of the statements in between. So I've got some snapshots that are a little – a little off. So I'll be missing stuff.

Q.  So to shorten this, you don't really have a paper trail that traces your assets at time of marriage through to the date of separation. In other words—

A. I don't have it with me.   I probably could create that, but that was not what I was asked to create * * *.

Transcript of Proceedings, pp. 180-181.

{¶ 80} Adding the $130,000 Security Benefit account to the $811,196.08 SEP/IRA account would have resulted in retirement account totals of $941,196.08 – a figure significantly higher than Cramer claimed in his calculation of retirement benefits as of the date the marriage ended ($858,767.17).   *See* Ex. DD.

{¶ 81} As was noted, Cramer had the burden of tracing his assets.   *Peck*, 96 Ohio App.3d at 734, 645 N.E.2d 1300.   "The focus in determining whether separate property has become marital property after commingling with marital property is traceability of separate assets."   *Oberly v. Oberly*, 2d Dist. Greene No. 06-CA-90, 2007-Ohio-4571, ¶ 10, citing *Peck*.   In view of the conflicting evidence, the confusion that Cramer introduced, the lack of any supporting documentation, and the lack of expert clarification, the trial court did not err in deciding to equally divide an increase of $286,118.24 in cash accounts.   Consequently, the fifth issue for review is without merit.

### F.   Midland Fund Rollover

{¶ 82} Cramer's sixth issue for review states that:

The  trial  court  erroneously  double-counted  $81,565.57  paid  in  to Security Benefits which was a rollover from the Midland Fund.

**{¶ 83}** Under this issue, Cramer again contends that the trial court erroneously included the Security Benefits account as a cash account. He maintains that this account consisted of a rollover of the $81,565.57 in the Midland account, a contribution of $41,528.29 ("new money") that was listed on his 2014 tax return as a contribution to his SEP, and a 6% bonus that was stated in the transaction summary on Defendant's Ex. CC and allegedly added to the $41,528.29 amount. According to Cramer, if these amounts are added to the existing balance of the Security Benefits account ($86,459.50), they would equal the balance the trial court found of $130,479.49. These matters were not testified to at trial and cannot be considered on appeal. *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-16, 2013-Ohio-2341, ¶ 19, citing *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Furthermore, as we stressed before, Cramer's evidence was contradictory, confusing, and not supported by documentation. He could have presented adequate documentation and/or expert testimony to trace his assets, but chose not to do so. Accordingly, the sixth issue for review is overruled.

### G. Life Insurance Policies

**{¶ 84}** Cramer's seventh issue for review is as follows:

> The trial court erred in determining the marital increase in Husband's Life Insurance policies and by not accounting for merely passive growth in the premarital portion.

**{¶ 85}** Under this issue, Cramer argues that the trial court erred in concluding that 100% of the increase in the value of his life insurance policies was martial property.

According to Cramer, this disregarded passive growth in the premarital portions.

**{¶ 86}** At the time of the marriage, Cramer owned some Prudential Life Insurance policies. *See* Defendant's Exs. WW, XX, and ZZ. No testimony was offered concerning these exhibits or the life insurance policies. Based on the content of the exhibits, the trial court concluded that the martial value of the three policies reflected in these exhibits was $12,435.79, and further concluded that the appreciation was not passive since money was regularly paid into the policies. The court, therefore, awarded Wright one-half the increased value, or $6,217.89.[7]

**{¶ 87}** According to our review of the exhibits, the cash surrender value of the three policies increased by the following amounts during the marriage: Ex. WW, $6,100.44 ($16,634.83 minus $10,534.39); Ex. XX, $5650.05 ($19,334.67 minus $13,684.62); and Ex. ZZ, $2,235.76 ($4,274.58 minus $2,038.82), for a total increase in value of $13,986.25.[8]

**{¶ 88}** Cramer contends that the trial court should have used the premiums paid for the 51 months of marriage on the policies. Excluding the payment for Ex. YY, the total premiums Cramer alleges that were paid on the policies is a total of $7,420.08. Cramer claims the rest of the appreciation in policy value is passive and is due to his

---

[7] The trial court did not include any amount for Defendant's Ex. YY, which appears to relate to a $5,000 life insurance policy issued on Cramer on January 25, 1971. This document is undated and contains no information pertaining to either the date of the marriage or the date the marriage ended. The trial court correctly disregarded it and we will do the same.

[8] Regarding Ex. ZZ, the trial court used the guaranteed cash value of the policy at the pertinent time to arrive at the increase in value. However, Ex. ZZ indicates that the policy was subject to a loan at all times. As a result, our calculation uses the net cash value, which would be the cash value minus the loan.

premarital separate property. According to Cramer, that is the amount that should be divided; alternatively, he suggests that he should receive 70% of the total growth in policy value. This is based on the proportion of his premarital interest to the total balance of the policies at termination.

{¶ 89} This argument fails, as Cramer's other contentions have, due to his neglect to properly trace assets. No underlying documentation was provided, and no testimony was given about these accounts. Whether the policies and the premiums paid were subject to accrued interest during the 51 month marriage, and, if so, what that percentage might be, is not revealed by the minimal documentation provided. The loan on the policy in Ex. ZZ was subject to 8% interest per year, but Cramer's figures do not reflect that. Again, no information was provided on any of these items. Furthermore, on this particular policy, Cramer used a yearly premium payment of $176.10 to calculate the amount of marital interest. However, the notice of premium for 2011 in Ex. ZZ indicates that the payment due is $207.80, which includes the interest due on the loan. Other amounts could be different in other years; that data was not provided.

{¶ 90} The point is that Cramer gave the trial court no information on which to trace the assets. As a result, the court did not abuse its discretion in awarding each side one-half of the increase in value during marriage. To the extent any error occurred, it was in Cramer's favor, as the trial court used a lower figure, $12,435.79, rather than $13,986.25, which was the actual increase in cash value of the policies. However, Wright dismissed her cross appeal, so this point is moot.

{¶ 91} Based on the preceding discussion, the seventh issue for review is without merit.

H.   Alleged Loans

{¶ 92} Cramer's eighth issue for review states that:

The trial court erred in not deducting the unpaid balances of money loaned or paid by Husband to Wife.

{¶ 93} In connection with this issue, Cramer contends that the trial court erred in finding that it could not address the issue of alleged loans that were made to Wright prior to the marriage.   These alleged loans included about $145,000 that Cramer paid before marriage on items like Wright's student loans, cosmetology tuition, and so forth.   The parties did not enter into any written agreement concerning these matters, and Wright denied they were loans.   Cramer testified about a spreadsheet he had made reflecting Wright's repayments of about $20,000, which stopped in 2013.   The trial court concluded that it could not address these matters, because all transfers occurred before the marriage and were outside the scope of the divorce action.

{¶ 94} According to Cramer, the $145,000 amount should have been credited against the eventual marital estate.   He further asserts that he should be reimbursed under a theory of recoupment.

{¶ 95} "The validity of antenuptial agreements has long been recognized in Ohio. * * * The Ohio Supreme Court has defined an antenuptial agreement as 'a contract entered into between a man and a woman in contemplation, and in consideration, of their future marriage whereby the property rights and economic interests of either the prospective wife or husband, or both, are determined and set forth in such instrument.' " *Hoffman v. Dobbins*, 9th Dist. Summit No. 24633, 2009-Ohio-5157, ¶ 6, quoting *Gross v. Gross*, 11 Ohio St.3d 99, 102, 464 N.E.2d 500 (1984).   (Other citation omitted.)   "These

agreements may include provisions concerning the disposition or devolution of property and payments for sustenance upon the death of one or other of the spouses, or provisions for the distribution of property and the sustenance or maintenance of one or other of the spouses, upon a separation or divorce, or any combination of the concerns between the parties." *Parrett v. Wright*, 2017-Ohio-764, 85 N.E.3d 1067, ¶ 9 (2d Dist.), citing *Gross.*

{¶ 96} "While antenuptial agreements are generally reduced to writing prior to marriage, the Ohio Supreme Court has recognized the validity of postnuptial memoranda or notes executed for the purpose of memorializing oral antenuptial agreements." *Hoffman* at ¶ 6, citing *In re Estate of Weber*, 170 Ohio St. 567, 167 N.E.2d 98 (1960), syllabus. In *Weber*, the court stressed that "[i]t seems to be essential * * * that the written agreement expressly refer to the antenuptial agreement and affirmatively shows that it is a memorandum of the oral antenuptial agreement." *Weber* at 574.

{¶ 97} "Postnuptial agreements, with specific limited exceptions, are not valid in Ohio." (Citation omitted.) *Hoffman* at ¶ 6. Specifically, R.C. 3103.06 provides that "[a] husband and wife cannot, by any contract with each other, alter their legal relations, except that they may agree to an immediate separation and make provisions for the support of either of them and their children during the separation."

{¶ 98} In *Dobbins v. Dobbins*, 12th Dist. Clermont No. CA92-03-031, 1992 WL 341001 (Nov. 23, 1992), the court of appeals found a post-nuptial written agreement potentially enforceable and not in violation of R.C. 3103.06, where the agreement explicitly stated that it served to memorialize an oral antenuptial agreement. *Id.* at *3. However, the court still found the post-nuptial agreement unenforceable because the facts under which the agreement was entered did not satisfy the requirements for

antenuptial agreements under Ohio law. *Id.*, citing *Gross v. Gross*, 11 Ohio St.3d 99, 464 N.E.2d 500 (1984).

{¶ 99} In *Gross*, the Supreme Court Ohio stated that antenuptial agreements are "valid and enforceable if (1) if they have been entered into freely without fraud, duress, coercion, or overreaching; (2) if there was full disclosure, or full knowledge and understanding of the nature, value and extent of the prospective spouse's property; and (3) if the terms do not promote or encourage divorce or profiteering by divorce." *Gross* at paragraph two of the syllabus.

{¶ 100} In the case before us, the parties did not enter into any written agreements prior to marriage. Furthermore, they concededly did not enter into any kind of written agreement after they were married that explicitly referenced the alleged prior oral agreement. They also did not enter into any postnuptial agreement for separation.

{¶ 101} On consideration of the evidence in the trial court and the law, we conclude that the trial court did err in stating that transfers prior to marriage were outside the scope of the divorce action. Had those transfers been the subject of proper prenuptial or postnuptial agreements, they may have been considered. However, under the undisputed facts here, the alleged premarital oral agreement was not the subject of an antenuptial written agreement in which it was explicitly referenced, and there was no antenuptial agreement that complied with R.C. 3103.06. As a result, there was no basis for recovery. The concept is well-established that "we may affirm a correct decision even if it is made for the wrong reasons." (Citations omitted.) *Routzahn v. Garrison*, 2d Dist. Montgomery No. 21190, 2006-Ohio-3652, ¶ 44.

{¶ 102} As a final matter, recoupment does not apply. "Recoupment is a defense

which arises out of the same transaction as plaintiff's claim, is a claim of right to reduce the amount demanded and can be had only to an extent sufficient to satisfy the plaintiff's claim." *Riley v. Montgomery*, 11 Ohio St.3d 75, 77, 463 N.E.2d 1246 (1984). It is based on the following principles – recoupment " 'does not confess the indebtedness alleged in the complaint, as is understood by a setoff, but its proposition is that the plaintiff's claim is based on a particular contract or transaction and that to entitle the plaintiff to the sum claimed, he must prove compliance with certain obligations of the contract; that he failed to do so; and therefore that the defendant has been so damaged in the transaction that the plaintiff is not entitled to recover.' " *Id.* (Citation omitted.)

{¶ 103} Here, Wright did not make a claim against Cramer in connection with the alleged loans, and there was no permissible contract to which "recoupment" could apply. Furthermore, even if this had been otherwise, recoupment is an affirmative defense that must "be asserted in the answer or amended answer; otherwise, it would be waived and could not be raised at trial." (Citations omitted.) *Haddad v. English*, 145 Ohio App.3d 598, 602, 763 N.E.2d 1199 (9th Dist.2001). No such defense was raised in Cramer's answer. *See* Doc. #16, Answer and Counterclaim for Divorce.

{¶ 104} Accordingly, the eighth issue is without merit.


I. General Claim of Error in Awarding Assets

{¶ 105} Cramer's ninth issue for review states that:

The trial court erred in awarding to Wife $457,000 in assets.

{¶ 106} Under this issue for review, Cramer asserts that the trial erred in awarding Wright $457,000 when the marital assets and income were not proven to justify that

award. Cramer acknowledges that the parties' total combined income was nearly 1.2 million dollars during the 51 months of their marriage. He contends, however, that their expenses, including federal and state taxes, retirement contributions, property taxes, and the alleged premarital loans would not have allowed accumulation of this large an amount. Notably, the alleged income that Cramer cites does not reflect any interest or gains realized on investments or savings during marriage, which may or may not have been spent on living expenses. Furthermore, the premarital expenses, like the money paid for Wright's student loans, are simply irrelevant.

{¶ 107} According to the trial court decision, Wright was awarded about $457,000 in money and other major assets, including a condominium that was purchased shortly before Wright filed for divorce. However, this amount was offset by various items Wright was required to pay Cramer that amounted to about $37,464, leaving the actual amount of her cash and property award to be about $419,356. In addition, Cramer is to receive an offset generated by his share of Wright's STRS retirement fund of $112,000. That amount was not specified in the court's decision, but it will be one-half of the martial portion of the account, using a coverture fraction based on 51 months of marriage. Thus, the end figure Wright receives would be even less after offsetting the STRS pension amount.

{¶ 108} As has been stressed, the evidence that Cramer presented was confusing and inadequately documented his separate assets and the tracing of those assets. Many items were also contradictory, questionable, and exaggerated. For example, at trial, Cramer discussed an amended affidavit of income and expenses he filed in October 2016. In contrast to the affidavit he originally filed in November 2015, which indicated

about $2,600 in monthly living expenses, the amended affidavit claimed almost $9,000 in living expenses per month. This latter figure included $5,340 monthly for a condominium that was purchased in August 2015. Cramer claimed in October 2016 that he was spreading the expense over 12 months.

**{¶ 109}** As a final matter, we are reversing the calculation of $77,835 in interest on the retirement accounts. That decreases the award by approximately $38,917 (half of $77,835), although that amount may change on remand, depending on the trial court's decision.

**{¶ 110}** Based on the preceding discussion, the ninth issue for review is without merit.

**{¶ 111}** Accordingly, Cramer's sole assignment of error is overruled in part and sustained in part with respect to the second issue for review.

## III. Conclusion

**{¶ 112}** Cramer's sole assignment of error having been overruled in part and sustained in part, the judgment of the trial court is affirmed in part and reversed in part. This cause will be remanded to the trial court for further proceedings, solely to decide an appropriate method of calculating appreciation on the marital portion of Cramer's retirement accounts.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.


Copies mailed to:

Charles D. Lowe
Thomas G. Eagle
Wayne Stephan
Hon. Denise L. Cross